UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PAUL MCGANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:16-cv-01235-JMS-DML |
| | ) | |
| BARBARA TRATHEN, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

Plaintiff Paul McGann was employed as a Marion County Sheriff's Deputy at the Indianapolis Motor Speedway ("<u>IMS</u>") on May 24, 2014, the evening before the Indianapolis 500. While Mr. McGann was working to control the crowd after a fight in the "Coke Lot," one of the parking lots near IMS, he was approached by Zachary Pollack. An altercation between Mr. McGann and Mr. Pollack took place, and Mr. McGann ultimately used his taser on Mr. Pollack and then arrested him for resisting law enforcement, battery, and illegal possession of alcohol by a minor. The charges against Mr. Pollack were eventually dropped, and Mr. McGann was charged with official misconduct and battery in connection with his arrest of Mr. Pollack. Defendant Barbara Trathen, a Deputy Marion County Prosecutor at the time, participated in the investigation of Mr. McGann and signed the probable cause affidavit to support the charges against him. Mr. McGann was tried and acquitted, and now brings this lawsuit against Deputy Prosecutor Trathen under 42 U.S.C. § 1983 for malicious prosecution based on her alleged connections to Mr. Pollack's father and the television network with which he is affiliated. Deputy Prosecutor Trathen has filed a Motion for Summary Judgment, [Filing No. 112], which is now ripe for the Court's decision.

# I.
## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d

892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A. The Coke Lot Incident

On May 24, 2014, the evening before the Indianapolis 500, Mr. McGann, a sergeant for the Marion County Sheriff's Office, was working crowd control at IMS. [Filing No. 113-4 at 8.] Around 7:00 p.m., Mr. McGann received a call from Air One, a helicopter assigned to the Indianapolis Metropolitan Police Department ("IMPD"), advising him that there was a large fight

in the Coke Lot. [Filing No. 113-4 at 9.] Mr. McGann arrived at the scene of the fight alone on his motorcycle, and it appeared that the fight had ended. [Filing No. 113-4 at 10-11.] The crowd began to converge on Mr. McGann, so he activated his motorcycle siren to try to get the crowd to back away. [Filing No. 113-4 at 11.] The crowd began pouring beer and water on Mr. McGann and throwing objects, so he attempted to move his motorcycle out of the area. [Filing No. 113-4 at 11-12.] Mr. McGann's left arm was hit by a bottle, and he then apprehended the individual who threw the bottle, deployed his taser, and was proceeding to arrest the individual for battery on a law enforcement officer. [Filing No. 113-4 at 12-13.]

While Mr. McGann had the individual on the ground, Mr. Pollack approached Mr. McGann's left side and asked Mr. McGann "what the f**k [he] was doing." [Filing No. 113-4 at 15-16.] Mr. Pollack was standing with his hands on his hips right next to Mr. McGann and Mr. McGann shoved him away. [Filing No. 113-3 at 0:24-0:28.][1] As Mr. McGann shoved Mr. Pollack away, Mr. Pollack said "I'm going to kick your f***ing ass," and Mr. McGann turned toward Mr. Pollack to drive stun[2] him with his taser. [Filing No. 113-4 at 17.] At that point, Mr. Pollack put his hands above his head and retreated back a bit. [Filing No. 113-3 at 0:28.] Mr. McGann felt that Mr. Pollack was "in a resistive mode" and was worried he would try to flee, so Mr. McGann deployed his taser on Mr. Pollack. [Filing No. 113-3 at 0:29-0:30; Filing No. 113-4 at 18.]

---

[1] Filing No. 113-3 is a video taken by an individual who was present at the Coke Lot during the incident and posted on YouTube, and is entitled "Kid Gets Taser at Indy 500" (the "Video"). The Video is authenticated through Mr. Pollack's Affidavit. [See Filing No. 113-21.]

[2] Mr. McGann explained in his deposition that he was carrying a taser rather than a stun gun, but that his taser gave him the ability to "drive stun someone" by making contact with the skin instead of "shoot[ing] probes." [Filing No. 113-4 at 14.]

**B. Mr. Pollack is Arrested and Charged**

Mr. McGann arrested Mr. Pollack for resisting law enforcement, battery, and illegal possession of alcohol by a minor. [Filing No. 113-17.] Mr. Pollack was transported to the Arrestee Processing Center. [Filing No. 113-7 at 13.] At the Arrestee Processing Center, Marion County Deputy Prosecutor Shari Blessing reviewed Mr. McGann's report from the arrest. [Filing No. 113-8 at 9.] Because she did not feel that she had enough information from the report to file charges against Mr. Pollack, Ms. Blessing requested a 72-hour continuance. [Filing No. 113-8 at 9.] Ms. Blessing sent Mr. McGann an email message on May 25, 2014 stating:

> Officer, I need more detail before I can file the resist and the battery charges. I need to know what he did physically to interfere with you and the first suspect. You said you had to taze him because he wouldn't stop resisting. Will you please provide detail on what he was doing? Pulling away? Kicking? Etc.
>
> The charging info says he grabbed you and that accounts for the battery charge. At what point and where did he[ ] grab you? Please describe.

[Filing No. 113-9.]

Mr. McGann responded to Ms. Blessing, stating:

> The subject while I was affecting arrest on the original suspect grabbed my left arm stated he was going to kick my ass for tasing the original suspect. I then towards… (sic) him when he tried to run off and we fell to the ground. He forcefully pulled his hands under his body[,] would not let me cuff him[,] and continuously tried to get up.

[Filing No. 113-9.]

Mr. Pollack was released on his own recognizance on May 25, 2014. [Filing No. 113-10 at 9.] He was picked up from the Arrestee Processing Center by Scott Hainey, a marketing executive at an affiliate of CBS and a former work colleague of Mr. Pollack's father, Michael Pollack. [Filing No. 123-2 at 4-5.] Mr. Pollack was subsequently charged with resisting law enforcement, battery, and illegal possession of alcohol by a minor. [Filing No. 113-6 at 3-5.]

## C.  Mr. Pollack Retains Counsel and the Charges Are Dismissed

On a recommendation from Mr. Pollack's aunt, Mr. Pollack hired attorney Brad Banks to defend him against the charges.  [Filing No. 123-2 at 5.]  Mr. Banks received and reviewed the Video, and thought it was exculpatory.  [Filing No. 113-11 at 8.]  He and Deputy Prosecutor David Ziemba brought the Video to the attention of Jeremy Johnson, another Deputy Prosecutor at the Marion County Prosecutor's Office.  [Filing No. 113-18 at 8-9.]  Mr. Johnson, along with Charnette Garner, another Marion County prosecutor, watched the Video and decided to dismiss the charges against Mr. Pollack.  [Filing No. 113-18 at 10; Filing No. 113-12 at 13.]  The charges against Mr. Pollack were dismissed on June 11, 2014.  [Filing No. 113-6 at 2.]

At the time, Barbara Trathen was the Supervisor of the Criminal Charging Division at the Marion County Prosecutor's Office.  [*See* Filing No. 123-9 at 5.]  Deputy Prosecutor Trathen's career had been the basis for a CBS television show called "Close to Home," for which she received a great deal of publicity.  [Filing No. 123-19; Filing No. 123-20; Filing No. 123-23 at 1-2.]  Additionally, Mr. Banks had worked with Deputy Prosecutor Trathen at the Hamilton County Prosecutor's Office, and was aware of Deputy Prosecutor Trathen's involvement in "Close To Home."  [Filing No. 123-12 at 11-12.]  Mr. Banks was also aware of Michael Pollack's position at CBS when he represented Mr. Pollack in his criminal case.  [Filing No. 123-12 at 11-12.]  Deputy Prosecutor Trathen and Michael Pollack had never met each other, however, and he did not work on "Close to Home" in connection with his duties at CBS.  [Filing No. 113-5 at 8; Filing No. 113-20 at 9; Filing No. 113-20 at 16.]

## D.  Mr. Banks Contacts Deputy Prosecutor Trathen

Shortly after the charges against Mr. Pollack were dismissed, Mr. Banks emailed Deputy Prosecutor Trathen and others stating:

Barb/Janna: Writing today regarding the actions of Sheriff Sergeant Paul McGann in the State of Indiana vs. Zachary Pollack 49F19-1405-CM-027294. I copied Charnette as she is familiar with the details. This deputy arrested my client for resisting law enforcement, battery and a later discovered minor possession of alcohol. The resisting law enforcement and battery were caught on video tape and verifiably a complete lie by the Sergeant. My client did not physically touch in the Sergeant in any fashion. The Sergeant proceeded to lie in an affidavit and say that my client both battered him and fled on foot. Neither happened and the state has rightfully dismissed all the charges.

This Sergeant should be investigated for false informing, official misconduct, and possible perjury (although I believe the PC was technically signed by the fictitious Captain signature). My client is a B+ student at IU with 0 criminal history and did not deserve to have this arrest happen. Upsetting to see a Sergeant behave in such a manner.

As I'm not sure who these things are being investigated by now, I wanted to try to move it forward through your office. Sorry for dropping this at your feet, but was very offended by the Sergeants willingness to completely lie in an affidavit.

Thanks!

[Filing No. 123-9 at 5-6.]

Deputy Prosecutor Trathen responded the next day, writing:

Mr. Banks: Thanks very much for forwarding the information!

Just an FYI---Charnette had forwarded the information --for investigation=====but, we have now started working together on this case. We will be meeting w/ the MCSO investigators in the morning and discussing what they have gathered up to this point. I am trying to be sure that we gather as much information as possible.

I understand from Charnette that you may have some information from a medical person---later examined your client---and would be able to provide some details on the taser wounds and / or number of taser strikes???

Also, I would very much like to have the investigators meet w/ your client for a statement??

Also, any medical records from your client???

Also, any testimony from any of his friends present at the scene???

Thanks so very much for your assistance----we will get this going.

[Filing No. 123-9 at 4-5.] Mr. Banks responded:

Yes he was seen at I med center. Estimated 4 to 5 tazer strikes. There are a number of witnesses we can provide tomorrow. I will inquire of his availability for a statement.

[Filing No. 123-9 at 4.]  Deputy Prosecutor Trathen then responded:

GREAT——thanks for the assistance.
Anything that would help to substantiate the # of taser would be great!
And, of course, witness info would be terrific!
Naturally, it would be extremely helpful to have his side of this event.
Thanks very much

[Filing No. 123-9 at 4.]  Mr. Banks responded to Deputy Prosecutor Trathen that Mr. Pollack "is willing to cooperate with the investigation," and Deputy Prosecutor Trathen responded "thanks so very much for your cooperation.  We are meeting now w/ Captain [Wayne] Sharp [of the Marion County Sheriff's Office] on the investigation.  Capt. Sharp is the 'lead investigator'  We will discuss the possibilities for interviewing your client===possibly on Skype/??  But, we should start w/ your witnesses & their interviews.  Please advise names + contact info & they will get started on that immediately."  [Filing No. 123-9 at 2-3.]  Mr. Banks then sent Deputy Prosecutor Trathen the names of five witnesses.  [Filing No. 123-9 at 2.]  Deputy Prosecutor Trathen forwarded the string of emails to Julia Holliday, a Marion County Prosecutor, stating "As I am reviewing Brad's emails====will forward some of them to you.  Good luck."  [Filing No. 123-9 at 1.]  She also forwarded the email string to Captain Sharp and Ms. Garner, stating "you have plenty to start working with!  Good luck!  [Filing No. 113-16 at 2.]

In the meantime, Deputy Prosecutor Trathen had also forwarded Mr. Banks' initial email to Ms. Garner, stating "do you have that file??  Can someone please bring it up to me??  Also, I would like to chat w/ the DP who actually handled the case==so that we can chat===before we involve SIU??"  [Filing No. 113-14 at 3.]  Ms. Garner responded to Deputy Prosecutor Trathen "This is the case I wanted to talk to you about several weeks ago.  I involved Michelle Waymire and she got the ball rolling, but the guys (sic) name is escaping me.  Michelle help?!!"  [Filing No.

113-14 at 3.] Ms. Waymire responded that she "talked to Hubbs," and Deputy Prosecutor Trathen then forwarded the email to Michael Hubbs with the Marion County Sheriff's Office to see to whom the file had been assigned. [Filing No. 113-14 at 2; Filing No. 113-15 at 4.] The email chain eventually made its way to Mr. Sharp with the Marion County Sheriff's Office, who responded to Deputy Prosecutor Trathen stating: "can we meet to go over the situation listed below – I am not sure I understand it – maybe you do – top brass asked us to do this – will you??" [Filing No. 113-15 at 3.] Mr. Sharp later testified that he was told by Colonel Reginald Grandy that "because this case involved a young man whose dad was a big shot, I think at NBC, that this wasn't going to go away and that we needed to have a thorough investigation….Zachary Pollack's dad was something…. A big shot and might even have been a different network, but I think NBC." [Filing No. 123-1 at 13.] Mr. Sharp stated "I wish I knew the station, the NBC affiliate, the local one, actually one of the top big shots there…went down and bailed Zachary out and posted bond." [Filing No. 123-1 at 18.] Mr. Sharp testified that the person who bailed Mr. Pollack out was "vocal about who they were." [Filing No. 123-1 at 19.]

### E. Mr. Sharp Begins Investigating the Incident

Mr. Sharp began his investigation into the incident between Mr. McGann and Mr. Pollack by interviewing several of Mr. Pollack's friends who were at the Coke Lot during the incident. [*See, e.g.*, Filing No. 113-7 at 5-6.] Mr. Pollack's friend, Scott Regan, stated that he saw Mr. Pollack walk over to Mr. McGann, that Mr. Pollack did not touch Mr. McGann, and that Mr. Pollack put his hands up "after he realized that he probably shouldn't have gone so close to the cop in a scary situation." [Filing No. 113-7 at 6.] Another friend, Alec Udell, was also present at the Coke Lot during the incident and saw Mr. Pollack approach Mr. McGann. [Filing No. 113-7 at 6.] Mr. Udell said that the "cop immediately turned to Zach and just tasered him without any

warning…. Zach threw his hands up right away like he wasn't – he was very innocent in the situation, and the cop tasered him." [Filing No. 113-7 at 6.]

Mr. Sharp also interviewed Sergeant Terry Wilds, who was assigned to patrol the Coke Lot on the day of the incident, and stated that he did not see Mr. Pollack strike Mr. McGann, but "saw him up next to him within inches away from him, and I saw Sgt. McGann have to reach back blindly to punch him back out of the way…." [Filing No. 113-7 at 7.] Sergeant Wilds also stated that Mr. Pollack continued to come up to Mr. McGann while he was trying to make an arrest. [Filing No. 113-7 at 7.]

On July 25, 2014, Mr. Sharp conducted an interview of Mr. Pollack via Skype. [Filing No. 113-7 at 8-10.] Mr. Banks, Deputy Prosecutor Trathen, Mr. Johnson, and Lieutenant William Rogers were also present. [Filing No. 123-8 at 1-2.] Mr. Pollack stated that, on the day of the incident, he saw the crowd begin to throw objects and saw Mr. McGann point his taser at the crowd, "then seconds later this kid from the crowd [was] on the ground." [Filing No. 123-8 at 9.] He stated that he walked over to Mr. McGann and said "What are you doing, Officer?" and that Mr. McGann then shoved him in the chest, which pushed him back. [Filing No. 123-8 at 10.] Mr. Pollack stated "And at that point I understood that my presence was not wanted, so I put my hands up above my head. Once I put my hands up above my head, he looked at me and jabbed the TASER into my right ribcage." [Filing No. 123-8 at 10.] Mr. Pollack, a criminal justice major at Indiana University at the time of the incident, stated that he "foolishly thought [he] could diffuse the situation." [Filing No. 123-3 at 2; Filing No. 123-8 at 11.]

On July 25, 2014, Mr. Sharp interviewed Mr. McGann in the presence of his attorney, Joel Hand. [Filing No. 113-7 at 10.] Mr. McGann described his version of the events leading up to

and including the incident with Mr. Pollack, including being in fear for his life during the incident. [Filing No. 113-7 at 10-12.]

### F.  Mr. McGann is Charged

After Mr. Sharp's interview of Mr. McGann ended, Mr. Hand met with Mr. Sharp, Deputy Prosecutor Trathen, Ms. Garner, Mr. Johnson, and Lieutenant Rogers to try to convince them that charges should not be filed against Mr. McGann.  [Filing No. 113-5 at 5; Filing No. 113-12 at 26; Filing No. 113-18 at 15.]  Mr. Sharp, Deputy Prosecutor Trathen, Ms. Garner, Mr. Johnson, and Lieutenant Rogers then took a vote, and all voted in favor of filing charges against Mr. McGann.

On October 1, 2014, Mr. Sharp filed a ten-page Probable Cause Affidavit and signed an Information charging Mr. McGann with official misconduct, a Class D felony, and battery.  [Filing No. 113-7 at 3-14.]  A Marion County Deputy Prosecutor signed the Information, and Mr. Sharp and Deputy Prosecutor Trathen signed the Probable Cause Affidavit.  [Filing No. 113-7 at 3-14.] The Probable Cause Affidavit contains Mr. McGann's description of the incident, as well as several witnesses' accounts.  A Marion Superior Court judge found probable cause for the charges and issued a warrant for Mr. McGann's arrest.  [Filing No. 113-7 at 2; Filing No. 113-7 at 5-14.]

### G.  Mr. McGann is Tried and Acquitted

Deputy Prosecutor Julia Holliday was assigned to prosecute the case against Mr. McGann, but did not ultimately try the case because she went on maternity leave.  [Filing No. 113-19 at 6-7; Filing No. 113-19 at 14-15.]  Mr. Johnson, along with Deputy Prosecutor Marios Fellouka, prosecuted the case, and Mr. McGann was found not guilty on both counts.  [Filing No. 113-18 at 17-19; Filing No. 1 at 5.]

## H. The Current Lawsuit

On May 19, 2016, Mr. McGann initiated this lawsuit against Deputy Prosecutor Trathen and several other defendants who were subsequently dismissed. After the Court ruled on a previous Motion to Dismiss filed by Deputy Prosecutor Trathen, the only claims that remain are claims against her in her individual capacity for Fifth and Fourteenth Amendment due process violations based on malicious prosecution related to her alleged insistence that Mr. McGann be prosecuted (but not for the actual initiation of a criminal prosecution, for which she is entitled to absolute immunity), and for negligent infliction of emotional distress and intentional infliction of emotional distress. [Filing No. 1 at 9-10; Filing No. 69.] Deputy Prosecutor Trathen has moved for summary judgment, arguing that Mr. McGann's malicious prosecution claim fails as a matter of law, that she is entitled to absolute immunity, and that she is entitled to qualified immunity.

## III.
### DISCUSSION

At the outset, the Court notes that its earlier ruling on Deputy Prosecutor Trathen's Motion to Dismiss narrowed Mr. McGann's claims against her. Specifically, the Court dismissed any claims Mr. McGann asserted against Deputy Prosecutor Trathen in her official capacity and any claims that relate to Deputy Prosecutor Trathen's initiation of Mr. McGann's criminal prosecution because Deputy Prosecutor Trathen is entitled to absolute immunity for such actions. [*See* Filing No. 69.] This leaves in play Mr. McGann's claims related to Deputy Prosecutor Trathen's insistence that Mr. McGann be criminally investigated, and her pursuit of filing charges against

him by obtaining a probable cause finding from the criminal court.[3] [Filing No. 69 at 11-13.]

## A. Absolute Immunity

Deputy Prosecutor Trathen argues that she is entitled to absolute immunity for initiating Mr. McGann's criminal prosecution and for requesting that law enforcement investigate Mr. McGann. [Filing No. 114 at 16-24.] She argues that asking the Marion County Sheriff's Office to investigate Mr. McGann was part of her "preparing for the initiation of judicial proceedings" against Mr. McGann, and was not an administrative function. [Filing No. 114 at 17-18.] Deputy Prosecutor Trathen also asserts that she "did not direct the Sheriff's Office's investigation of McGann or directly participate in the investigation," but only forwarded witness information to Mr. Sharp to help him with his investigation. [Filing No. 114 at 18.] She attests that she had no personal involvement with Mr. Pollack's father, Michael Pollack. [Filing No. 114 at 19-22.] Further, Deputy Prosecutor Trathen disputes Mr. McGann's allegation that sheriff's deputies testified that they would not have investigated Mr. McGann but for Deputy Prosecutor Trathen's insistence. [Filing No. 114 at 22-24.]

Mr. McGann responds that Deputy Prosecutor Trathen is not entitled to absolute immunity because the evidence "clearly indicates that she was operating as an investigator, not a prosecutor." [Filing No. 124 at 20.] Mr. McGann points to evidence indicating that the Marion County Prosecutor's Office initiated the investigation; that, prior to filing charges, Deputy Prosecutor

---

[3] The Court also declined to dismiss Mr. McGann's claim related to Deputy Prosecutor Trathen's alleged role in his resignation. [Filing No. 69 at 12-13.] The Court noted, however, that Mr. McGann did not respond to Deputy Prosecutor Trathen's arguments regarding those allegations, and that "the allegation surrounding Deputy Prosecutor Trathen's involvement with Mr. McGann's resignation cannot support a claim for malicious prosecution on its own because it did not result in the criminal action being instituted against him, which Mr. McGann does not dispute…." [Filing No. 69 at 12.] Mr. McGann does not address these allegations at all in his briefing and, in any event, they would relate to Deputy Prosecutor Trathen's potential malice which, as is evident from the discussion below, the Court need not consider.

Trathen told Mr. Sharp that her office would be interviewing witnesses; that, prior to filing charges, Deputy Prosecutor Trathen engaged in email exchanges with Mr. Banks asking for the names of witnesses and coordinating an interview with Mr. Pollack, without including the Marion County Sheriff's Department on the emails; that Deputy Prosecutor Trathen drafted and signed off on the Probable Cause Affidavit; and that Deputy Prosecutor Trathen interviewed Mr. Pollack. [Filing No. 124 at 20.]

In reply, Deputy Prosecutor Trathen disputes that Mr. McGann has pointed to evidence that sheriff's deputies would not have investigated Mr. McGann but for Deputy Prosecutor Trathen's insistence. [Filing No. 131 at 10-13.]

Absolute immunity is of a "'rare and exceptional character,'" and officials who seek to take advantage of absolute immunity bear the burden of "showing that overriding considerations of public policy require that they be exempt from personal liability for their alleged unlawful conduct." *Auriemma v. Montgomery*, 860 F.2d 273, 275 (7th Cir. 1988) (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985)). The Seventh Circuit Court of Appeals has recognized absolute immunity for state court judges and prosecutors for acts that are part of their official duties, and for witnesses for their testimony. *Barksdale v. Joyce*, --- Fed. Appx. ----, 2017 WL 3776237, *1 (7th Cir. 2017); *see also Doermer v. Callen*, 847 F.3d 522, 530 (7th Cir. 2017) ("immunity doctrines shield certain classes of government defendants from liability for misconduct. Judges, prosecutors, and officials who fill quasi-judicial and quasi-prosecutorial roles are entitled to absolute immunity from damages stemming from many of their official acts, no matter how erroneous or harmful"). Absolute immunity does not extend, however, to acts that are "administrative and investigatory." *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017).

"Protection hinges not on the defendant's job title, but on the nature of the function [she] performed." *Id.*

As the Court noted in its Order on Deputy Prosecutor Trathen's Motion to Dismiss:

It is well-established that absolute immunity "encompasses quintessentially prosecutorial functions like an out-of-court effort to control the presentation of a witness' testimony and the acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial." *Bianchi* [*v. McQueen*, 818 F.3d 309, 318 (7th Cir. 2016)] (citations omitted). Included in this absolute immunity are "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek indictment has been made." *Id.* But a prosecutor "is not absolutely immune for acts that go beyond the strictly prosecutorial to include investigation. A prosecutor acting in an investigative capacity may claim only the same qualified immunity that protects police officers and other law-enforcement investigators." *Id.* (citations omitted); *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) ("A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity."). Moreover a prosecutor may not shield investigative work with absolute immunity "merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial." *Buckley*, 509 U.S. at 276.

[Filing No. 69 at 10.]

The parties dispute whether Deputy Prosecutor Trathen had a role in the investigation of Mr. McGann – Deputy Prosecutor Trathen argues that she "did not direct the Sheriff's Office's investigation of McGann or directly participate in the investigation," [Filing No. 114 at 18], and Mr. McGann argues that she did both. This dispute highlights why the Court cannot grant Deputy Prosecutor Trathen's Motion for Summary Judgment as it relates to absolute immunity. Indeed, the Court finds that Mr. McGann has pointed to evidence that Deputy Prosecutor Trathen did have a role in investigating Mr. McGann. Mr. Banks emailed Deputy Prosecutor Trathen suggesting that Mr. McGann should be investigated for criminal conduct and Deputy Prosecutor Trathen responded to Mr. Banks asking (enthusiastically so) for information regarding the number of times Mr. Pollack was tased and the names of witnesses. [Filing No. 123-9 at 4-5.] Deputy Prosecutor

Trathen also communicated with the Marion County Sheriff's Office regarding the investigation. [Filing No. 113-15.] Additionally, she was present for the interview of Mr. Pollack and the transcript indicates that she participated behind the scenes in questioning him. [*See, e.g.*, Filing No. 123-8 at 2 (Deputy Prosecutor Trathen instructing Mr. Sharp to ask Mr. Pollack his name at the beginning of the interview); Filing No. 123-8 at 14 (Deputy Prosecutor Trathen instructing Mr. Sharp to ask Mr. Pollack what his connection to an individual was and where he lives); Filing No. 123-8 at 21 (Deputy Prosecutor Trathen remarking that Mr. Pollack named "four of the guys" and asking "[d]id he know anyone else there?").] Moreover, Deputy Prosecutor Trathen signed the Probable Cause Affidavit.[4] The Court finds Deputy Prosecutor Trathen's insistence that she did not participate in the initiation of the investigation of Mr. McGann or directly participate in the investigation to be disturbingly disingenuous.

In sum, the very acts that Mr. McGann complains of – Deputy Prosecutor Trathen's participation in the initiation of the investigation of Mr. McGann and in the investigation itself – are clearly investigatory in nature and, accordingly, are acts for which Deputy Prosecutor Trathen is not entitled to absolute immunity. Deputy Prosecutor Trathen's Motion for Summary Judgment as it relates to absolute immunity for Mr. McGann's claims is **DENIED**.

### B. Qualified Immunity

Deputy Prosecutor Trathen argues that she is entitled to qualified immunity for her actions because she did not violate Mr. McGann's constitutional rights since there is no evidence that any

---

[4] The Court is puzzled by Deputy Prosecutor Trathen's argument that she only signed the Probable Cause Affidavit to "indicat[e] to the criminal court that the officer was affirming that the facts contained within the affidavit are true and correct," and that she "is not affirming the facts themselves." [Filing No. 131 at 6-7 (emphasis omitted).] The fact remains that Deputy Prosecutor Trathen's signature appears under a line stating "I swear or affirm, under the penalty of purjury (sic), that I believe and have good cause to believe the foregoing to be a true statement." [Filing No. 113-7 at 5-14.]

witness statements were false, that the Video was "doctored," or that she had reason to doubt the veracity of the witnesses.  [Filing No. 114 at 25.]  Deputy Prosecutor Trathen also argues that Mr. McGann has not identified a closely analogous case showing that her "conduct was so egregious that a reasonable person would know that her actions violated the constitution without guidance from the courts."  [Filing No. 114 at 25.]  She argues that Mr. McGann has not provided a case "clearly establishing that it is unconstitutional to ask law enforcement to investigate a case where a law enforcement officer's report and statements are plainly contradicted by video that establishes probable cause for the elements of the charged offenses."  [Filing No. 114 at 25.]

In response, Mr. McGann argues that the Seventh Circuit has recognized that "the Fourth Amendment protects against…malicious prosecution where a police officer withholds information or provides false information that is relevant to a prosecutor's probable cause inquiry."  [Filing No. 124 at 21 (citation and quotation omitted).]  He asserts that "there is no evidence that, once the actual prosecution of Mr. McGann had begun in earnest, Ms. Trathen ever once advised anyone about her interest in the case."  [Filing No. 124 at 21.]

On reply, Deputy Prosecutor Trathen argues that there was nothing for her to disclose since she did not have a personal interest or bias in connection with Mr. McGann's investigation.  [Filing No. 131 at 13.]  She notes that Mr. McGann's actions were video recorded, that her direct involvement was with Warner Brothers and not CBS, and that her involvement with Warner Brothers is not information that could "possibly exonerate or tend to exonerate" Mr. McGann's video-recorded actions.  [Filing No. 131 at 14.]

While absolute immunity focuses on the nature of the defendant's actions, qualified immunity focuses on the substance of those actions.  "Government officials performing discretionary functions enjoy a qualified immunity from suit." *Leaf v. Shelnutt*, 400 F.3d 1070,

1079 (7th Cir. 2005). It is "immunity from suit rather than a mere defense to liability." *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 988 (7th Cir. 2012) (emphasis, citation, and quotation marks omitted). "Qualified immunity gives government officials 'the benefit of legal doubts.'" *Rooni v. Bizer*, 742 F.3d 737, 743 (7th Cir. 2014) (quoting *Elliott v. Thomas*, 937 F.2d 338, 341 (7th Cir. 1991)); *see also Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) ("Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties"). Its purpose is "to provide reasonable notice to government officials that certain conduct violates constitutional rights before a plaintiff can subject them to liability." *Narducci v. Moore*, 572 F.3d 313, 318 (7th Cir. 2009). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Once the defense of qualified immunity is raised, 'it becomes the plaintiff's burden to defeat it.'" *Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012) (quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)).

"To determine whether a defendant is entitled to qualified immunity, courts must address two issues: (1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was clearly established at the time of the violation." *Rooni*, 742 F.3d at 742 (citation omitted). The Court may decide these issues in either order. *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012). If the right at issue was not clearly established at the time of the violation, the Court may exercise its discretion not to determine whether the defendant violated the plaintiff's constitutional right. *See Pearson*, 555 U.S. at 236 ("[T]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding

which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

To determine whether a right is clearly established, the Court looks to controlling precedent from both the Supreme Court of the United States and the Seventh Circuit Court of Appeals, and if there is no such precedent it "cast[s] a wider net" and examines "all relevant case law to determine whether there was such a clear trend in the case law that [it] can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 731 (7th Cir. 2013) (quotation and citation omitted). As set forth by the Supreme Court, "a court must ask whether it would have been clear to a reasonable [official] that the alleged conduct 'was unlawful in the situation [she] confronted.' If so, then the defendant [official] must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity. If not, however – *i.e.*, if a reasonable [official] might not have known for certain that the conduct was unlawful – then the [official] is immune from liability." *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1850 (2017) (citation omitted).

Before discussing the rights upon which Mr. McGann's malicious prosecution claim is based, the Court notes that Mr. McGann has not provided any evidence of a direct connection between Deputy Prosecutor Trathen and Michael Pollack. The Court agrees with Deputy Prosecutor Trathen that she could not have disclosed a connection that did not exist. Mr. McGann has, however, presented evidence of a connection between Deputy Prosecutor Trathen

and CBS,[5] and the discussion below focuses on Deputy Prosecutor Trathen's failure to disclose that connection.

The Court also views Mr. McGann's malicious prosecution claim as focusing on two time periods – when the decision to investigate Mr. McGann was made, and when the Prosecutor's Office sought a probable cause determination so that Mr. McGann could be charged and prosecuted. The Court discusses each time period in turn.

1. *The Decision to Investigate Mr. McGann*

a. <u>Whether the Right Was Clearly Established</u>

Mr. McGann does not argue in his response brief that the right to be free from an investigation when the investigating official (here, Deputy Prosecutor Trathen) has a connection to the victim's father's employer was clearly established in 2014. Accordingly, he has waived any argument that this is the case. In any event, the Court finds that such a right was not clearly established. Mr. McGann has not presented any case law discussing such a right, nor can the Court identify any such case law. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (To defeat a qualified immunity defense, a plaintiff need not point to a case that is factually identical to the present suit but "existing precedent must have placed the statutory or constitutional question beyond debate"); *May v. Sheahan*, 226 F.3d 876, 884 (7th Cir. 2000). As a result, Deputy Prosecutor Trathen is entitled to qualified immunity for any claim related to her investigation of Mr. McGann.[6]

---

[5] Deputy Prosecutor Trathen argues that she consulted with Warner Brothers for "Close to Home" and the show "merely aired on CBS, a decision in which Trathen had no say." [Filing No. 131 at 7.] Viewing the evidence in the light most favorable to Mr. McGann as the non-movant, the Court finds that a reasonable jury could infer that Deputy Prosecutor Trathen had a connection with CBS, since it ultimately aired the show with which she was involved.

[6] Because the Court finds that the right at issue related to Deputy Prosecutor Trathen's investigation of Mr. McGann was not clearly established, it need not consider whether the alleged activity constituted a constitutional violation. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

> 2. *Seeking a Probable Cause Determination to Charge and Prosecute Mr. McGann*
>
>> a. <u>Whether the Right Was Clearly Established</u>

Mr. McGann also bases his malicious prosecution claim on his allegation that Deputy Prosecutor Trathen failed to disclose her connection to CBS in the Probable Cause Affidavit. [*See* Filing No. 124 at 21 (arguing in response to the qualified immunity argument that Deputy Prosecutor Trathen "improperly withheld key information about her own personal interests and possible biases in a probable cause affidavit against a police officer….").] Mr. McGann points to case law prohibiting a police officer from withholding information or providing false information that is "relevant to a prosecutor's probable cause inquiry." [Filing No. 124 at 21 (citation and quotation omitted).] He also cites to cases requiring a police officer to provide exculpatory information or evidence.

In 2014, when Mr. McGann was charged, the Seventh Circuit Court of Appeals had set forth the standard for obtaining probable cause to charge an individual. Specifically, the Seventh Circuit instructed in 2003 that a "warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue." *Knox v. Smith*, 342 F.3d 651, 658 (7th Cir. 2003). In a 2012 case, the Seventh Circuit defined "reckless disregard for the truth" as a showing that "the officer 'entertained serious doubts as to the truth' of the statements, had 'obvious reasons to doubt their accuracy,' or failed to disclose facts that he or she 'knew would negate probable cause.'" *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (quoting *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003)). The Seventh Circuit has not, however, set forth whether failing to disclose in a probable cause affidavit a personal connection between one of the prosecutors seeking the probable

cause determination and the victim's father's employer is a constitutional violation. Again, while it is true that Mr. McGann need not identify an identical case, he must at least identify a case that indicates that the "constitutional question [is] beyond debate." *Ashcroft*, 563 U.S. at 741.

Mr. McGann attempts to overcome this hurdle by categorizing the connection between Deputy Prosecutor Trathen and CBS as "exculpatory evidence." [*See, e.g.*, Filing No. 124 at 22 (discussing cases finding that a police officer must disclose exculpatory evidence to officers who are investigating the case and seeking a probable cause determination).] But there is a disconnect in Mr. McGann's argument. Mr. McGann assumes that had Deputy Prosecutor Trathen disclosed a connection between herself and CBS, the criminal court would not have found probable cause to charge him. In other words, he assumes that such a connection would have been exculpatory. He does not point to any case law, however, indicating that that would have been the result. *See Hart v. Mannina*, 798 F.3d 578, 592-93 (7th Cir. 2015) (to determine whether an omission from a probable cause affidavit was material, courts "examine whether a hypothetical affidavit that included the omitted material would still establish probable cause"; if fact omitted from probable cause affidavit would not have negated probable cause, then there was no constitutional violation) (citation and quotation omitted). The Court rejects Mr. McGann's characterization of a connection between Deputy Prosecutor Trathen and CBS as "exculpatory" such that its disclosure was required by clearly established law.

The Court also finds it significant that the Probable Cause Affidavit here was ten pages, and included Mr. McGann's statement in its entirety along with the statements of other witnesses including other police officers. Mr. McGann does not argue that any of the statements in the Probable Cause Affidavit are false, or were coerced in some way. *Cf. Owens v. Downey*, 150 F.Supp.3d 1008, 1018 (S.D. Ind. 2015) (plaintiff stated a claim for malicious prosecution where

he sufficiently alleged that defendants lacked probable cause to pursue criminal charges against him based on probable cause affidavit that omitted his own version of events and included only statements from alleged victims).

Because the right to a determination of probable cause based on an affidavit that discloses a tenuous connection between one of the prosecutors and the employer of the victim's father was not clearly established in 2014,[7] Deputy Prosecutor Trathen is entitled to qualified immunity on Mr. McGann's claims related to the filing of charges against him and his prosecution based on the probable cause finding.[8]

### C. State Law Claims

Mr. McGann's Complaint includes negligent infliction of emotional distress and intentional infliction of emotional distress claims against Deputy Prosecutor Trathen. [Filing No. 1 at 10.] However, he did not mention those claims in his Statement of Claims, instead only stating that he seeks damages as a result of his prosecution, including emotional damages. [Filing No. 97 at 1.] Additionally, the parties do not address those claims in connection with the Motion for Summary Judgment. The Court finds that Mr. McGann has abandoned any negligent infliction of emotional distress or intentional infliction of emotional distress claims by failing to set them forth

---

[7] Again, because the Court has already found that the right at issue related to charges and prosecution based on the Probable Cause Affidavit was not clearly established in 2014, it need not consider whether there was a constitutional violation.

[8] Having found that Deputy Prosecutor Trathen is entitled to qualified immunity on Mr. McGann's malicious prosecution claim, the Court need not and will not consider whether Mr. McGann's claim fails as a matter of law.

in his Statement of Claims.[9]

## IV.
### CONCLUSION

The Court **GRANTS IN PART** Deputy Prosecutor Trathen's Motion for Summary Judgment, [Filing No. 112], to the extent it finds that Deputy Prosecutor Trathen is entitled to qualified immunity on Mr. McGann's malicious prosecution claim. The Court also finds that Mr. McGann has abandoned his negligent infliction of emotional distress and intentional infliction of emotional distress claims against Deputy Prosecutor Trathen. Final judgment shall enter accordingly.


Date: 11/20/2017

*[signature]*

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana


**Distribution via ECF only to all counsel of record**

---

[9] In any event, since the Court has found that Deputy Prosecutor Trathen is entitled to qualified immunity on Mr. McGann's malicious prosecution claim – the only federal claim in this lawsuit – it would decline to exercise supplemental jurisdiction over the negligent infliction of emotional distress and intentional infliction of emotional distress claims even if they had not been abandoned by Mr. McGann. *See Carlsbad Technology Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim…if…the district court has dismissed all claims over which it has original jurisdiction….") (citation and quotation omitted).